# In the United States Court of Federal Claims

No. 15-1403C
(Filed Under Seal: February 23, 2016)
(Reissued for Publication: March 11, 2016)[*]

| | |
|---|---|
| **************************************** | |
| PHOENIX MANAGEMENT, INC.,        * | |
| * | Bid Protest; Motion to Supplement the |
| Plaintiff,        * | Administrative Record; Motion to Dismiss; |
| * | Waiver; <u>Blue & Gold Fleet</u>; <u>COMINT</u> |
| v.        * | <u>Systems</u>; Effect of Postaward Corrective |
| * | Action in Which Competition Was |
| THE UNITED STATES,        * | Reopened but Solicitation Not Amended |
| * | |
| Defendant.        * | |
| **************************************** | |

John C. Dulske, San Antonio, TX, for plaintiff.

David D'Alessandris, United States Department of Justice, Washington, DC, for defendant.

**OPINION AND ORDER**

**SWEENEY**, Judge

In this bid protest, plaintiff Phoenix Management, Inc. contends that the solicitation at issue is defective because it does not include information required by offerors to prepare competitive proposals, does not reflect that certain costs would be evaluated, and does not provide for an evaluation of the offerors' past performance. Defendant moves to dismiss plaintiff's protest, arguing that plaintiff waived any challenge to the terms of the solicitation, and both parties move for judgment on the administrative record. In addition, plaintiff moves to supplement the administrative record with documents related to the procurement, as well as with documents from other procurements and the declaration of one of its employees. For the reasons set forth below, the court grants in part and denies in part plaintiff's motion to supplement the administrative record, and grants defendant's motion to dismiss.

---

[*] This reissued Opinion and Order incorporates the agreed-to redactions proposed by the parties on March 10, 2016. The redactions are indicated with bracketed ellipses ("[. . .]").

# I. BACKGROUND

## A. The Solicitation

On February 18, 2015, Headquarters Air Force Reserve Command ("Air Force") issued solicitation FA-6606-15-R-0001 for the acquisition of Base Operating Services at Westover Air Reserve Base ("ARB") in Chicopee, Massachusetts.[1] AR 27-28. The successful offeror was to provide "all personnel, supervision, equipment, tools, materials, supplies, test equipment, and other items and services necessary" to perform the following functions: Operation of the Base Supply System, Vehicle Operations and Maintenance, Traffic Management, Transient Aircraft Services, Real Property Maintenance, Fuels Management, and Airfield Management. Id. at 566; accord id. at 28-118, 562-841. The Air Force contemplated awarding a firm-fixed-price contract with cost-reimbursable and labor-hour contract line items. Id. at 28-118, 189. The contract would have an initial term of ten months and four one-year option periods, id. at 28-118, and was set aside for a service-disabled, veteran-owned small business ("SDVOSB") concern, id. at 136 (incorporating Federal Acquisition Regulation ("FAR") 52.219-27).

### 1. The Work to Be Performed

The Performance Work Statement appended to the solicitation provided a comprehensive description of each of the seven functional areas for which the successful offeror would be responsible. Id. at 562-841. Specifically, the Air Force provided a description of the services to be provided, extensive workload estimates, and information that could be used by offerors to develop their own workload estimates (such as itemized lists of equipment requiring servicing). Id. at 591-841. Moreover, for the Vehicle Operations and Maintenance functional area, the Air Force provided estimated costs for parts needed to repair designated equipment, id. at 621, and for the Traffic Management functional area, the Air Force provided estimated costs for certain billing and shipping transactions, id. at 642.

In section B of the solicitation, the Air Force enumerated the specific contract line items for which it was seeking proposals. Id. at 28-118. The items were divided into several categories. Id. One category–Monthly Service–contained firm-fixed-price items for the functions described in the Performance Work Statement; these items encompassed "all labor and materials" necessary to perform those functions. Id. (setting forth contract line item numbers ("CLINs") *002-*013[2]); accord id. at 566 ("All services, labor, supplies, materials, and parts are

---

[1] The court derives the facts in this section from the administrative record filed by defendant ("AR") and, as explained in more detail below, from portions of the supplemental administrative record submitted by plaintiff ("SAR").

[2] The contract line items for the base contract term, and the final three digits of the CLINs associated with those items, are repeated for each of the four option periods. AR 28-118. The only digit of the CLINs that varies is the first digit; CLINs for the base contract term begin

included in the Firm Fixed Price unless otherwise specified in the contract."). Two additional, identically titled categories–Labor for Service Calls–contained labor-hour items for nonrecurring real property maintenance and services; these items were separate and distinct from the firm-fixed-price items. Id. at 28-118 (setting forth CLINs *014-*018, which concerned Service Contract Act labor categories, and CLIN *019, which concerned Davis Bacon Act labor categories). A fourth category–Reimbursable Items–contained cost-reimbursable items for the direct parts and materials associated with the performance of nonrecurring real property maintenance and services. Id. (setting forth CLINs *020-*024). And, a fifth category–Over and Above Work–contained labor-hour items for labor categories not covered by the Service Contract Act or the Davis Bacon Act; these items were separate and distinct from the firm-fixed-price items. Id. at 28-118 (setting forth CLINs *025-*031), 204-06 (listing the labor categories).

### 2. Proposal Requirements

Pursuant to section L of the solicitation, as amended, offerors were to submit their proposals in three volumes: a volume containing administrative/contract documentation, a volume containing the offeror's technical proposal, and a volume containing the offeror's price proposal. Id. at 929-30, 932-35. The technical proposal was to include transition, quality control, and staffing plans, as well as information supporting the offeror's technical capabilities in each functional area. Id. at 933-34. The submission of past performance information was not required. Id. The price proposal was to include a completed Pricing Matrix containing the offeror's proposed prices for the firm-fixed-price CLINs, as well as fully loaded labor rates for the Service Contract Act, Davis Bacon Act, and Over and Above labor categories. Id. at 935, 1059-67; accord id. 204-06.

### 3. Evaluation Criteria

The Air Force, in section M of the solicitation, provided that it intended to award the contract on a lowest-price, technically acceptable basis. Id. at 201. It advised prospective offerors:

> The Government will select the offeror based on an integrated assessment of the offeror[']s technical proposal and proposed price information. The first step of the evaluation process is to determine if the technical proposals are acceptable or unacceptable in accordance with the evaluation criteria. Among the proposals that have been determined acceptable in technical capabilities, a price analysis will be accomplished and all offerors will be ranked from lowest to highest evaluated price. . . . The Government will award to the offeror who is determined to have the lowest evaluated price among offerors who were determined to be acceptable in technical capabilities.

---

with "0," while the four option period CLINs begin with "1" through "4," respectively. Id. The asterisk represents this varying initial digit.

<u>Id.</u>  Of import in this protest is the manner in which the Air Force intended to evaluate the offerors' price proposals.  It explained:

> 4.  PRICE EVALUATION:
>
> The offeror's Price proposal will be evaluated for reasonableness and balance. . . . Total Evaluated Price . . . will be calculated . . . .
>
> > (a)  Reasonableness:  The existence of adequate price competition is expected to support a determination of reasonableness.  Price analysis techniques may be used to further validate price reasonableness.  If adequate price competition is not obtained or if price reasonableness cannot be determined using price analysis of Government obtained information, additional information in accordance with FAR 15.4 may be required to support the proposed price.
> >
> > (b)  Balance:  Offerors are cautioned against submitting an offer that contains unbalanced pricing.  Unbalanced pricing exists when, despite an acceptable total evaluated price, the price of one or more contract line items is significantly overstated or understated as indicated by the application of proposal analysis techniques.  The Government shall analyze offers to determine whether there are unbalanced separately priced line items or sub-line items.  Prices submitted will be compared and evaluated to assure that a logical progression exists as related to price and quantity changes within each offeror's response to the pricing structure in Section B.  Offers that are determined to be unbalanced may be rejected if the lack of balance poses an unacceptable risk to the Government.
> >
> > (c)  Total Evaluated Price:  A Total Evaluated Price . . . will be used for evaluation purposes only and will be calculated as follows:
> >
> > > (1)  The extended prices (unit price x quantity) for all of the firm, fixed price CLINs *001 - *013, *035 . . . will be totaled.
> > >
> > > (2)  The "Service Contract Act Labor" applicable to CLINs *014 - *018 will be evaluated as follows:  The proposed fully-loaded labor rates set forth in the "SCA Labor Rates" worksheet in [the Pricing Matrix] shall be multiplied by a predetermined amount of estimated hours . . . for each labor category . . . .  These extended amounts will be totaled for each contract period.  These estimated hours apply to all contract periods and are for evaluation purposes only.

. . . .

(3) The "Davis Bacon Act Labor" applicable to CLIN *019 will be evaluated as follows: The proposed fully-loaded labor rates set forth in the "DBA Labor Rates" worksheet in [the Pricing Matrix] shall be multiplied by a predetermined amount of estimated hours . . . for each labor category listed below in all years. These extended amounts will be totaled for each contract period. These estimated hours apply to all contract periods and are for evaluation purposes only.

. . . .

(4) The "Over & Above Labor" applicable to CLINs *025 - *031 will be evaluated as follows: The proposed fully-loaded labor rates set forth in the "O&A Labor Rates" worksheet in [the Pricing Matrix] shall be multiplied by a predetermined amount of estimated hours . . . for each labor category listed below in all years. These extended amounts will be totaled for each contract period. These estimated hours apply to all contract periods and are for evaluation purposes only.

. . . .

(5) For evaluation purposes only, a lump sum dollar amount of $750,000 per performance period for reimbursable parts and materials will be used to determine the material-handling fee. . . .

(6) The sums derived from Paragraphs (1), (2), (3)[,] (4), and (5) above will be added together to develop each offeror's "total evaluated price".

Id. at 203-06. The Air Force did not include the "predetermined amount of estimated hours" in the solicitation. Id.; see also id. at 1046 (noting, in response to a question from a prospective offeror, that "[e]stimated hours used to evaluate[] labor hour rates as part of the lowest price amount will not be provided to help prevent unbalanced bids"). Indeed, in the Pricing Matrix, the Air Force listed a quantity of one hour for each labor category. Id. at 1060-64.

In addition, the Air Force did not indicate that it intended to separately evaluate the offerors' other direct costs ("ODCs") as part of its price evaluation. Id. at 203-06. It provided

the following question-and-answer exchanges to prospective offerors on this topic, presumably in advance of the deadline for proposals:[3]

> Question B106
>
> . . . . There [is a] significant amount of vehicles, shop equipment, parts, supplies, vendor services, and consumable materials . . . required under the Firm Fixed Price portion of this effort. Some are rather large capital expenses for any size business, especially for many SDVOSB companies who may or may not have experience operating a [Base Operating Services] contract. As such, how will the government analyze and evaluate the items ([ODCs]) that an offeror places in their pricing to ensure the offeror has proposed the minimum amount of items to successfully operate the contract?
>
> Answer B106–Proposals will be evaluated in accordance with section M of the [Request for Proposals]. An ODC cost breakdown is not asked for in section L and [ODCs] will not be evaluated costs.
>
> Question B107
>
> . . . . There [is a] significant amount of vehicles, shop equipment, parts, supplies, vendor services, and consumable materials . . . required under the Firm Fixed Price portion of this effort. Will cost realism be conducted, to cover both proposed labor and all [ODCs] such as the aforementioned items? If so, how will cost realism be conducted under this [lowest-price, technically acceptable] procurement?
>
> Answer B107–Proposals will be evaluated in accordance with section M of the [Request for Proposals]. Offeror's bid will be evaluated for reasonableness.

Id. at 1048.

---

[3] These questions and answers are included in an undated document titled "Westover ARB, MA Questions & Answers #2." AR 1032, 1048. In compiling the administrative record, defendant included this document with Amendment 2 to the solicitation, which was issued on March 18, 2015. See id. at 1005-56. However, defendant included a clarification to one of its answers from this document–which would necessarily have to postdate the document–with Amendment 1 to the solicitation, which was issued one day earlier on March 17, 2015. See id. at 926, 999. Although the issuance date of these questions and answers is uncertain, given the usual practice of procuring agencies, the court presumes that the undated document was provided to offerors in advance of the deadline for proposals.

Also of import in this protest is the Air Force's decision not to evaluate the offerors' past performance. In a January 30, 2015 Determination and Findings document, the contracting officer for the procurement concluded that the evaluation of past performance was not necessary to determine the successful offeror. Id. at 1-2. As the basis for his conclusion, he found:

> 3. Department of Defense Source Selection Procedures . . . outline[] the evaluation criteria for past performance in a [lowest-price, technically acceptable] source selection process as follows:
>
>> A.2. 1.2. Past Performance. Past performance shall be used as an evaluation factor within the [lowest-price, technically acceptable] process, unless waived by the [procuring contracting officer] in accordance with FAR 15.101-2(b). It shall be evaluated in accordance with FAR 15.305 and [Department of Defense Federal Acquisition Regulation Supplement] 215.305. However, the comparative assessment in FAR 15.305(a)(2)(i) does not apply. Therefore, past performance will be rated on an "acceptable" or "unacceptable" basis . . . .
>>
>> . . . .
>>
>> Note: In the case of an offeror without a record of relevant past performance or for whom information on past performance is not available or so sparse that no meaningful past performance rating can be reasonably assigned, the offeror may not be evaluated favorably or unfavorably on past performance (see FAR 15.305(a)(2)(iv)). Therefore, the offeror shall be determined to have unknown past performance. In the context of acceptability/unacceptability, "unknown" shall be considered "acceptable."
>
> 4. Based on the note regarding the lack of past performance information on a particular offeror that would result in an acceptable rating there would not be any method of eliminating an offeror based upon a lack of previous experience in the functional areas that are included in our [Base Operating Services] requirements.
>
> 5. During the source selection process for [Base Operating Services] at Homestead ARB [. . .] filed a protest with the Government Accountability Office [("GAO")] over its elimination for further consideration based on a failure to meet the established minimum qualification as established in the Request for Proposal . . . for that acquisition. The GAO contacted the Small Business Administration [("SBA")] and based on the response from the SBA stating that a Certificate of Competency [("COC")] should have been requested for [. . .] since the minimum qualification review was essentially a past performance evaluation [sic]. As a result of this decision from the SBA it has been decided that the Minimum Qualifications Requirement that had historically been incorporated into the [Base

> Operating Services] source selection across the command [was] no longer an effective evaluation tool and would not be incorporated into future [Base Operating Services] source selection in [Air Force Reserve Command].
>
> 6. During the four most recent [Base Operating Services] acquisitions at March ARB, Homestead ARB, Dobbins ARB, and Niagara Falls [Air Reserve Station ("ARS")] the source selection team conducted a thorough and detailed evaluation of all offerors in the competitive range. The results of those evaluation[s] revealed none of the small businesses in the competitive range had any past performance information that would have had a negative impact upon their consideration for award.

Id. The contracting officer therefore determined that, in accordance with FAR 15.304(c)(3)(iii), "the inclusion of a past performance evaluation factor for Westover ARB [Base Operating Services] source selections [would] not provide any significant information that would affect the decision . . . as to which offerors will be ultimately selected for the awards." Id. at 2.

## B. Contract Award and Debriefing

Offerors were to submit their proposals to the Air Force by April 1, 2015. Id. at 1005. Plaintiff and ten other offerors submitted proposals. Id. at 1068-69. On June 24, 2015, the Air Force notified plaintiff that another company, Veteran Facility Services LLC ("VFS"), was the "apparent successful offeror." Id. at 1068. Subsequently, on August 6, 2015, the Air Force sent plaintiff a Notice of Award indicating that it had awarded the contract to VFS. Id. at 1069. The Air Force also advised plaintiff that plaintiff's total evaluated price was [. . .], approximately [. . .] more than VFS's total evaluated price of $40,756,816.92. Id.

On August 10, 2015, plaintiff requested a debriefing from the Air Force, which the Air Force provided, in writing, the following day. Id. at 1070-72. As part of this written debriefing, the Air Force provided plaintiff with a copy of plaintiff's completed Price Matrix that included the Air Force's "predetermined amount of estimated hours" for each labor category. Id. at 1071, 1073-81.

## C. Protests Before the GAO and Corrective Action

Plaintiff lodged a protest with the GAO on August 13, 2015, challenging the Air Force's evaluation of VFS's technical proposal and the Air Force's evaluation of price proposals. Id. at 1082-105. Eight days later, plaintiff lodged a supplemental protest with the GAO objecting to the Air Force's failure to provide offerors with its "predetermined amount of estimated hours" for each labor category. Id. at 1106-12.

While plaintiff's protest was pending before the GAO, the contracting officer concluded that certain communications with offerors may have been erroneously classified as clarifications.

Id. at 1126. He therefore determined that corrective action was necessary. Id. The corrective action would include (1) reviewing the nine technically acceptable proposals, (2) issuing evaluation notices if discussions were warranted, (3) requesting final proposal revisions, and (4) making a new award decision. Id. On September 11, 2015, the Air Force notified the GAO of its intent to take corrective action, stating:

> The Agency has decided to open discussions, request final proposal revisions and make a new award decision. If an offeror other than the current awardee is found to have the lowest priced, technically acceptable proposal, the Air Force will terminate the current contract and award a new contract. In the meantime, the Air Force will stay performance on the current contract during corrective action. The Air Force may also undertake any additional actions it deems appropriate.

Id. at 1127. The Air Force requested that the GAO dismiss plaintiff's original and supplemental protests as moot. Id. The GAO did so on September 15, 2015. Id. at 1129-30.

The Air Force sent evaluation notices to plaintiff on September 29, 2015. Id. at 1131-36. Plaintiff responded to the notices. Id. at 1132-42. In addition, on October 1, 2015, plaintiff sent a letter to the Air Force raising two objections to the solicitation:

> (1) [Phoenix Management, Inc. ("PMI")] notes that the Solicitation does not include past performance as an evaluation criteria. PMI understands that past performance must be submitted and evaluated before award. FAR § 15.304(c)(3)(i). Therefore, PMI objects and does not waive any right to challenge this solicitation defect in the event PMI is not awarded the contract.

> (2) PMI notes that the Solicitation does not include a proper evaluation of [ODCs] in the proposed price evaluation. The ODCs for contract performance are substantial. Without a proper breakdown or evaluation (for realism and reasonableness) [of] an offeror's ODCs, the agency is not effectively evaluating price as required by the FAR. PMI understands that price must be submitted and evaluated before award. FAR § 15.304(c)(1). Therefore, PMI objects to the price evaluation set forth in the Solicitation and does not waive any right to challenge this solicitation defect in the event PMI is not awarded the contract.

SAR 1143. The Air Force responded to plaintiff's letter on October 5, 2015. Id. at 1144-45. With respect to the plaintiff's first objection, the Air Force advised plaintiff that, pursuant to FAR 15.304(c)(iii) and Air Force Federal Acquisition Regulation Supplement 15.101-2(b)(1), "a Determination and Findings [was] in the file explaining why past performance was not included in the solicitation." Id. at 1144. It also noted, in response to plaintiff's reference to "minimum qualifications" during a separate telephone conversation, the following:

> Minimum qualifications were included in the Homestead [Base Operating Services] solicitation. When a small business was excluded for not having minimum qualifications, they protested and [SBA] [sic]. The ruling was that the offeror should have been referred to SBA for a [COC]. Since SBA can and will issue COCs to anyone that doesn't meet the minimum qualifications, minimum qualification have [been] removed from our solicitation.

Id. With respect to plaintiff's second objection, the Air Force wrote:

> FAR 15.403(c)(1) states that adequate price competition is an exception to certified cost or pricing data. FAR 15.404-1(a)(2) states that price analysis shall be used when certified cost or pricing data are not required. FAR 15.404-1(b)(1) describes price analysis as the process of examining and evaluating a proposed price without evaluating its separate cost elements and proposed profit. FAR 15.404-1(b)(2)(i) states that comparison of proposed prices received in response to the solicitation is a price analysis technique and normally adequate price competition establishes a fair and reasonable price. Based on these FAR references, this office cannot ask for and evaluate a breakdown of [ODCs].

Id. at 1145.

In a November 18, 2015 letter, the Air Force requested that plaintiff submit its final proposal revision by November 20, 2015, specifically indicating that plaintiff could revise its price proposal. Id. at 1146-47. Plaintiff, in a November 20, 2015 letter, advised the Air Force that its price proposal stood as originally submitted and that its technical proposal stood with the revisions submitted in response to the evaluation notices. Id. at 1148.

### D. The Present Protest

One day before its final proposal revision was due, plaintiff filed the instant protest. It sets forth three claims for relief in its complaint. First, it objects to "the proposed price evaluation and the government's decision not to provide offerors the 'predetermined amount of estimated hours' for each labor classification used in evaluating CLINs *014-*018, *019, and *025-*031." Compl. ¶ 8; accord id. ¶¶ 26-33. Second, it objects to "the Solicitation's proposed price evaluation and the decision not to meaningfully evaluate offeror[s' ODCs] before determining whether the proposed price is reasonable and balanced." Id. ¶ 8; accord id. ¶¶ 34-40. Third, it objects to "the government's decision not to include a past performance evaluation in violation of procurement statute and regulations." Id. ¶ 8; accord id. ¶¶ 41-45. Plaintiff requests appropriate declaratory and injunctive relief. Id. at 18.

Defendant moves to dismiss plaintiff's protest, and the parties cross-move for judgment on the administrative record. In addition, plaintiff moves to supplement the administrative record with documents related to the procurement, as well as with documents from other

procurements and the declaration of one of its employees. The court heard argument on February 22, 2015.

## II. PLAINTIFF'S MOTION TO SUPPLEMENT THE ADMINISTRATIVE RECORD

The court first addresses plaintiff's motion to supplement the administrative record. Generally, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." Camp v. Pitts, 411 U.S. 138, 142 (1973). An administrative record typically contains the materials developed and considered by an agency in making a decision subject to judicial review. See id. at 142-43 (remarking that an agency's finding must be "sustainable on the administrative record made" by the agency at the time of its decision); Cubic Applications, Inc. v. United States, 37 Fed. Cl. 345, 349-50 (1997) ("[T]he primary focus of the court's review should be the materials that were before the agency when it made its final decision."). The administrative record "should be supplemented only if the existing record is insufficient to permit meaningful review consistent with the [Administrative Procedure Act]." Axiom Res. Mgmt., Inc. v. United States, 564 F.3d 1374, 1381 (Fed. Cir. 2009); accord id. at 1380 ("[S]upplementation of the record should be limited to cases in which the 'omission of extra-record evidence precludes effective judicial review.'" (quoting Murakami v. United States, 46 Fed. Cl. 731, 735 (2000), aff'd, 398 F.3d 1342 (Fed. Cir. 2005))).

In its motion, plaintiff requests that the administrative record be supplemented with (1) documents related to the Westover ARB Base Operating Services procurement (designated as Supplemental Administrative Record Tabs 48 to 51), (2) documents related to other Base Operating Services procurements (designated as Supplemental Administrative Record Tabs 52 to 54), and (3) the declaration of plaintiff's Vice President of Marketing and Business Development, Gary J. Giarratano ("Giarratano Declaration"). Defendant does not object to the supplementation of the record with the documents related to the Westover ARB Base Operating Services procurement because it mistakenly omitted those documents from the administrative record. Nor does defendant object to the court's consideration of paragraphs 1, 2, 3, 11, and 12 of the Giarratano Declaration as they pertain to plaintiff's allegations of harm. However, defendant does object to the supplementation of the administrative record with the documents related to other procurements, the Giarratano Declaration generally, and the two exhibits attached to the Giarratano Declaration. Moreover, in its briefs in support of its cross-motion for judgment on the administrative record, defendant moves to strike all references to these latter materials–with the exception of paragraphs 1, 2, 3, and 12 of the Giarratano Declaration–from plaintiff's briefs.[4]

---

[4] In its briefs in support of its cross-motion for judgment on the administrative record, defendant specifically moves to strike references to paragraph 11 of the Giarratano Declaration. However, defendant's position regarding paragraph 11 is less clear in its response to plaintiff's motion to supplement the administrative record. Compare Def.'s Resp. to Pl.'s Mot. to Supplement the Admin. R. 2 ("We do not oppose consideration of paragraphs one through three

-11-

The first three documents to which defendant objects are (1) a Notice of Partial Corrective Action related to the procurement of Base Operating Services at Youngstown ARS that was issued by the Air Force on December 8, 2015, SAR 1150-51; (2) a protest that plaintiff lodged with the GAO on July 31, 2015, with respect to the procurement of Base Operating Services at Dobbins ARB, id. at 1152-65; and (3) an August 28, 2015 Notice of Corrective Action related to an unspecified procurement that was issued in response to a GAO protest lodged by plaintiff,[5] id. at 1166-67.  As plaintiff acknowledges, none of these documents concerns the Westover ARB Base Operating Services procurement.  Rather, plaintiff offers the documents to establish that "in two virtually identical procurements this same contracting agency found it necessary to correct the very solicitation defect now challenged in this protest in Count No. 1."  Pl.'s Reply to Def.'s Resp. to Pl.'s Mot. to Supplement the Admin. R. ("Pl.'s Reply Supplement") 4.  The court declines to supplement the administrative record with cherry-picked documents from other procurements, even if the procuring agency and the services to be procured are alleged to be identical.  Moreover, as discussed below, the three documents offered by plaintiff are unnecessary for the court's disposition of this protest.  The court therefore denies plaintiff's motion with respect to these documents.

The other documents to which defendant objects are the Giarratano Declaration and attached exhibits.  Paragraphs 1 through 3 of the declaration generally pertain to Mr. Giarratano's position and qualifications, and paragraphs 11 and 12 concern the prejudice and harm that plaintiff would purportedly suffer in the absence of injunctive relief.  The remainder of the declaration contains assertions regarding the preparation of plaintiff's price proposal, and the exhibits include an excerpt from the incumbent contract (designated as exhibit B-1) and a table prepared by plaintiff setting forth ODCs and reimbursable costs for the incumbent contract (designated as exhibit B-2).  Plaintiff contends that the declaration and attached exhibits must be included in the administrative record to facilitate meaningful judicial review of the merits of its protest, as well as to establish its entitlement to injunctive relief.  With respect to the former contention, however, plaintiff does not explain in its motion how the declaration and attached exhibits would allow for meaningful judicial review.  Moreover, in its reply brief, plaintiff only attempts to justify the necessity of paragraph 9 of the declaration and one of the attached

---

and eleven and twelve in support of Plaintiff's allegations of harm."), with id. at 6 (characterizing paragraph 11 as containing Mr. Giarratano's "opinion on how the Air Force should have evaluated the past performance of bidders.").  Contrary to defendant's characterization, paragraph 11 of the Giarratano Declaration concerns the prejudice and harm purportedly suffered by plaintiff as a result of the Air Force's decision not to evaluate the offerors' past performance.  Accordingly, the court will consider paragraph 11 as one of the paragraphs of the Giarratano Declaration to which defendant does not object (along with paragraphs 1, 2, 3, and 12).

[5] The GAO's online docket reflects that the protest from which the August 28, 2015 Notice of Corrective Action arose concerned solicitation FA6703-15-R-0004, which is the same solicitation at issue in the protest lodged by plaintiff on July 31, 2015.  See GAO, U.S. GAO - Bid Protests, http://www.gao.gov/legal/bid-protests/search (last visited Feb. 11, 2016).

exhibits, explaining:

> [P]aragraph 9 of Mr. Giarratano's declaration and Exhibit B-2 present historical cost data relating to reimbursable costs incurred by PMI on the incumbent contract. Thus, the information contained in these two documents confirms that the government possessed this historical cost data prior to issuing the subject Solicitation. Moreover, this is critical cost information the government should have shared with all offerors prior to submission of final proposal revisions on November 20, 2015. Importantly, the government does not challenge the veracity of the historical cost data presented in Paragraph 9 of Mr. Giarratano's declaration and Exhibit B-2.

Pl.'s Reply Supplement 4. This explanation is insufficient to establish that the portion of the Giarratano Declaration addressing the preparation of plaintiff's price proposal and the attached exhibits are necessary for meaningful judicial review. First, although it can be reasonably concluded from paragraph 9 and exhibit B-2 that plaintiff and the Air Force possessed historical cost data for the incumbent contract, neither paragraph 9 nor exhibit B-2 contains information necessary to establish that the historical cost data should have been provided to offerors prior to the deadline for final proposal revisions. Whether the Air Force was required to provide prospective offerors with the historical cost data in its possession is purely a question of law. Second, the justification plaintiff provides in support of supplementing the administrative record with paragraph 9 and exhibit B-2 cannot be used as a justification to supplement the administrative record with the remainder of the Giarratano Declaration or the other attached exhibit. Finally, as discussed below, the contents of the Giarratano Declaration and attached exhibits are unnecessary for the court's disposition of this protest. The court therefore denies plaintiff's motion with respect to these documents.

      In sum, the court grants plaintiff's motion to supplement the administrative record with the documents related to the Westover ARB Base Operating Services procurement (designated as Supplemental Administrative Record Tabs 48 to 51). The court denies plaintiff's motion with respect to the documents related to other Base Operating Services procurements (designated as Supplemental Administrative Record Tabs 52 to 54), the Giarratano Declaration, and the exhibits attached to the Giarratano Declaration. In conjunction with this latter ruling–and defendant's motion to strike–the court will disregard all references to, and arguments based on, these documents–with the exception of paragraphs 1, 2, 3, 11, and 12 of the Giarratano Declaration–that are contained in plaintiff's briefs in support of its motion for judgment on the administrative record.

### III.  DEFENDANT'S MOTION TO DISMISS

#### A.  Standard of Review

The court next addresses defendant's motion to dismiss plaintiff's protest.  Defendant brings its motion pursuant to Rule 12(b)(6) of the Rules of the United States Court of Federal Claims ("RCFC"), contending that because plaintiff has waived any challenges to the terms of the solicitation, it fails to state a claim upon which relief can be granted.[6]  To survive such a motion, a plaintiff must include in its complaint "enough facts to state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  In other words, a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atl., 550 U.S. at 556).

#### B.  Waiver

In Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308 (Fed. Cir. 2007), the United States Court of Appeals for the Federal Circuit ("Federal Circuit") affirmed the conclusion of the Court of Federal Claims that the protestor's challenge to the terms of the solicitation, which was not raised until after the deadline for the submission of proposals, was untimely.  Id. at 1312-16.  In doing so, the Federal Circuit recognized, for the first time, a waiver rule for bid protests, holding that

> a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims.

Id. at 1313; accord id. at 1315; Bannum, Inc. v. United States, 779 F.3d 1376, 1380 (Fed. Cir. 2015).  It found support for such a waiver rule in (1) the statutory mandate of 28 U.S.C. § 1491(b)(3) that courts are to "give due regard to . . . the need for expeditious resolution of" bid protests, (2) the fairness rationale underlying the doctrine of patent ambiguity, (3) the GAO's rule

---

[6] Although defendant mentions RCFC 12(b)(1) in its motion to dismiss, it does not rely on that rule in seeking the dismissal of plaintiff's protest.  See Def.'s Cross-Mot. 7 ("Phoenix fails to offer a proper basis upon which this Court can entertain its claims.  Accordingly, this Court should dismiss the complaint for failure to state a claim upon which relief may be granted."), 10 ("Phoenix has waived the arguments contained in each count of its complaint . . . and its complaint must be dismissed pursuant to RCFC 12(b)(6).").  Moreover, the United States Court of Federal Claims ("Court of Federal Claims") has concluded that the waiver rule invoked by defendant in this case "creates an equitable, rather than jurisdictional, bar to a disappointed offeror's untimely challenge to the terms of a government solicitation."  Linc Gov't Servs., LLC v. United States, 96 Fed. Cl. 672, 698 (2010).

that challenges to the terms of a solicitation must be brought prior to the deadline for submitting bids or proposals, and (4) the analogous doctrines of laches and equitable estoppel in the patent context. Blue & Gold Fleet, 492 F.3d at 1313-15. Of these rationales for the recognition of a waiver rule, the Federal Circuit placed particular emphasis on fairness and the expeditious resolution of bid protests:

> In the absence of a waiver rule, a contractor with knowledge of a solicitation defect could choose to stay silent when submitting its first proposal. If its first proposal loses to another bidder, the contractor could then come forward with the defect to restart the bidding process, perhaps with increased knowledge of its competitors. A waiver rule thus prevents contractors from taking advantage of the government and other bidders, and avoids costly after-the-fact litigation.

Id. at 1314; see also id. at 1315 ("[T]he statutory mandate of [28 U.S.C.] § 1491(b)(3) for courts to 'give due regard to . . . the need for expeditious resolution of the action' and the rationale underlying the patent ambiguity doctrine favor recognition of a waiver rule."); DGR Assocs., Inc. v. United States, 690 F.3d 1335, 1343 (Fed. Cir. 2012) ("[I]f there is a patent, i.e., clear, error in a solicitation known to the bidder, the bidder cannot lie in the weeds hoping to get the contract, and then if it does not, blindside the agency about the error in a court suit.").

The Federal Circuit revisited the Blue & Gold Fleet waiver rule in COMINT Systems Corp. & EyeIT.com, Inc., Joint Venture v. United States, 700 F.3d 1377 (Fed. Cir. 2012). In that case, the procuring agency amended the solicitation four months after the proposal submission deadline. Id. at 1380. More than two months later, it awarded three contracts pursuant to the amended solicitation. Id. The protestor objected to the terms of the amendment, but did not lodge a protest until after the procuring agency awarded the contracts. Id. at 1380-81. Specifically, the protestor lodged a protest with the GAO almost two weeks after the contracts were awarded, and then, two months later, after the GAO denied its protest, filed a complaint with the Court of Federal Claims. Id. at 1380.

On review, the Federal Circuit agreed with the government that the protestor failed to preserve its challenge to the terms of the solicitation amendment by not raising it prior to the award of the contracts. Id. at 1381. Although it recognized that the Blue & Gold Fleet waiver rule was not directly applicable to the circumstances before it because the solicitation was amended after the proposal submission deadline, the Federal Circuit concluded that the reasoning of Blue & Gold Fleet "applie[d] to all situations in which the protesting party had the opportunity to challenge a solicitation before the award and failed to do so." Id. at 1382; see also id. (remarking that the policy behind the Blue & Gold Fleet waiver rule supported the extension of the rule "to all pre-award situations"). Accordingly, it held that "assuming that there is adequate time in which to do so, a disappointed bidder must bring a challenge to a solicitation containing a patent error or ambiguity prior to the award of the contract." Id.; accord id. ("[W]here bringing the challenge prior to the award is not practicable, it may be brought thereafter."); see also Bannum, 779 F.3d at 1381 (holding that the protestor had waived its "solicitation challenge by

not properly raising it before the close of bidding" and noting that the protestor had not argued that such a challenge would be "impractical" or that its failure to raise such a challenge was excusable for good cause).

### C. Plaintiff Waived Its Challenges to the Terms of the Solicitation

The facts relevant to defendant's waiver argument are straightforward: (1) the Air Force issued the solicitation on February 18, 2015; (2) the proposal deadline was April 1, 2015; (3) in advance of the proposal deadline, the Air Force specifically addressed the absence of its "predetermined amount of estimated hours" and any mention of ODCs from the solicitation in response to questions from prospective offerors; (4) in advance of timely submitting its proposal, plaintiff did not object–formally or informally–to the terms of the solicitation; (5) the Air Force awarded the contract to VFS on August 6, 2015; (6) plaintiff lodged a protest with the GAO on August 13, 2015, challenging the contract award; (7) plaintiff lodged a supplemental protest with the GAO on August 21, 2015, objecting to the Air Force's failure to provide offerors with its "predetermined amount of estimated hours" for each labor category; (8) the Air Force notified the GAO of its intent to take corrective action on September 11, 2016; (9) the GAO dismissed plaintiff's protests on September 15, 2015; (10) the Air Force proceeded with its corrective action, which consisted of opening discussions, requesting final proposal revisions, and making a new award decision; (11) the corrective action did not include any amendments to the solicitation; (12) during discussions, plaintiff advised the Air Force that it objected to two purported solicitation defects–the absence of past performance as an evaluation factor and the absence of ODCs from the price evaluation–and indicated that it did not "waive any right to challenge [these] solicitation defect[s] in the event [it] is not awarded the contract"; (13) final proposal revisions were due on November 20, 2015; (14) plaintiff filed this protest on November 19, 2015, challenging the terms of the solicitation; and (15) plaintiff advised the Air Force on November 20, 2015, that the materials it had already submitted constituted its final proposal revision.

Defendant argues that under the waiver rule set forth in Blue & Gold Fleet, plaintiff should have protested the terms of the solicitation prior to the April 1, 2015 proposal submission deadline–"the close of the bidding process"–because all of the defects currently alleged by plaintiff were apparent at the time that the Air Force issued the solicitation. Defendant further contends that the Air Force's decision to take corrective action did not extend the deadline for plaintiff to protest the terms of the solicitation because the Air Force did not amend the solicitation as part of its corrective action; in other words, the purported solicitation defects that plaintiff is challenging in this post-corrective-action protest are the same purported solicitation defects that existed when the Air Force first issued the solicitation. Because plaintiff did not file this protest before the original deadline for filing proposals, defendant argues, it waived its challenges to the unchanged terms of the solicitation.

In arguing that it has not waived its challenges to the terms of the solicitation, plaintiff relies on a hypertechnical reading of the language used by the Federal Circuit in Blue & Gold

Fleet and COMINT Systems.  In Blue & Gold Fleet, the Federal Circuit held that an objection to a patent solicitation error must be raised "prior to the close of the bidding process," 492 F.3d at 1313, and in COMINT Systems, the Federal Circuit held that an objection to a patent solicitation error must be raised "prior to the award of the contract," 700 F.3d at 1382.  Plaintiff remarks that as a result of the Air Force's decision to take corrective action, the Air Force reopened the competition, allowed for the submission of final proposal revisions, and planned to make a new award decision.  These actions, plaintiff contends, constituted a reopening of the bidding process.  Because it filed this protest before the deadline for submitting final proposal revisions (and, consequently, before the Air Force made a new award decision), plaintiff argues that it filed its protest before "the close of the bidding process" and before "the award of the contract."

In light of the rationale underlying the Blue & Gold Fleet waiver rule, plaintiff's hypertechnical construction of the rule is untenable.  The Federal Circuit explained in Blue & Gold Fleet that the purpose of the waiver rule was to prevent an offeror with knowledge of a solicitation defect from sitting on that knowledge until after the procuring agency awarded the contract and then, if unsuccessful in securing the contract, using that knowledge–along with any knowledge gleaned during the competition and from the debriefing–as the basis for a protest in a second attempt to secure the contract.  492 F.3d at 1314.  As the Federal Circuit noted, to allow an offeror two bites at the apple would be unfair to, and costly for, the procuring agency and the other offerors.  Id.  In fact, it explained in COMINT Systems that the policy underlying the Blue & Gold Fleet waiver rule supported the extension of the rule "to all pre-award situations."  700 F.3d at 1382.

Here, the purported solicitation defects identified by plaintiff existed when the Air Force issued the solicitation on February 18, 2015.  As a consequence, plaintiff had ample opportunity to challenge these purported defects prior to the April 1, 2015 proposal submission deadline, either through an agency-level protest, by lodging a protest at the GAO, or by filing a protest in this court.  Indeed, plaintiff does not argue that raising such a challenge was impractical or that its failure to do so was excusable for good cause.  It was not until the Air Force awarded the contract to another offeror that plaintiff, in a supplemental GAO protest, objected to the terms of the solicitation.  Binding precedent makes clear that this objection was untimely.[7]  See Blue & Gold Fleet, 492 F.3d at 1314 (noting that under GAO protest regulations, challenges to solicitation improprieties that are apparent prior to the deadline for the receipt of initial proposals must be raised prior to that deadline).  The Air Force's subsequent decision to take corrective action did not transform plaintiff's untimely challenge into a timely one.  Because the Air Force's decision to take corrective action was based on a perceived defect in its evaluation of proposals, and not with any defect in the solicitation, it did not amend the solicitation.[8]  Thus, any defects

---

[7] Moreover, had plaintiff raised that challenge in a protest in this court, the court would have been obligated to dismiss it pursuant to the Blue & Gold Fleet waiver rule.

[8] Because the Air Force's corrective action did not include any changes to the solicitation, plaintiff's reliance on the Federal Circuit's holding in COMINT Systems that an

that existed in the solicitation during the Air Force's corrective action were present in the solicitation when the Air Force originally issued it. Consequently, a previously unsuccessful offeror attempting to object to the terms of the solicitation during the corrective action would be running afoul of the underlying purpose of the Blue & Gold Fleet waiver rule–preventing offerors from withholding knowledge to get a second chance to secure a contract, to the detriment of the procuring agency and the other offerors. Postaward corrective action that does not include the issuing of a new or amended solicitation–such as the corrective action involved in this protest–does not resurrect the ability of an unsuccessful offeror to object to the terms of a solicitation.

In short, by not objecting to the terms of the solicitation prior to the April 1, 2015 proposal submission deadline, plaintiff waived those objections. The court must therefore grant defendant's motion to dismiss.

### IV. CONCLUSION

For the foregoing reasons, the court **GRANTS** plaintiff's motion to supplement the administrative record with the documents related to the Westover ARB Base Operating Services procurement (designated as Supplemental Administrative Record Tabs 48 to 51). The court **DENIES** plaintiff's motion to supplement the administrative record with the documents related to other Base Operating Services procurements (designated as Supplemental Administrative Record Tabs 52 to 54), the Giarratano Declaration, and the exhibits attached to the Giarratano Declaration. The court disregards all references to, and arguments based on, these latter documents–with the exception of paragraphs 1, 2, 3, 11, and 12 of the Giarratano Declaration–that are contained in plaintiff's briefs in support of its motion for judgment on the administrative record. Further, the court **GRANTS** defendant's motion to dismiss and **DISMISSES** plaintiff's protest with prejudice. No costs. The clerk is directed to enter judgment accordingly.

---

objection to a patent solicitation error must be raised "prior to the award of the contract," 700 F.3d at 1382, is unfounded. In COMINT Systems, the procuring agency amended the solicitation after the proposal submission deadline but before contract award. Id. at 1380. The Federal Circuit concluded that any challenge to the amendment should have been made prior to contract award to avoid invocation of the Blue & Gold Fleet waiver rule. Id. at 1382; see also Ne. Constr., Inc. v. United States, 119 Fed. Cl. 596, 610 (2015) ("[T]he waiver rule articulated in COMINT Systems is limited to situations where the solicitation was amended after the proposal due date, and does not render timely every challenge to the terms of a solicitation lodged prior to contract award."). In this case, the Air Force did not amend the solicitation anytime after the initial proposal submission deadline of April 1, 2015. Accordingly, the relevant deadline in this case is "the close of the bidding process," as described in Blue & Gold Fleet, 492 F.3d at 1313, and not "the award of the contract," as described in COMINT Systems, 700 F.3d at 1382.

    The court has filed this ruling under seal.  The parties shall confer to determine agreed-to proposed redactions.  Then, by **no later than Tuesday, March 15, 2016**, the parties shall file a joint status report indicating their agreement with the proposed redactions, **attaching a copy of those pages of the court's ruling containing proposed redactions, with all proposed redactions clearly indicated.**

    **IT IS SO ORDERED.**

                                             s/ Margaret M. Sweeney  
                                             MARGARET M. SWEENEY  
                                             Judge